IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

H.H., a minor, by and through
　her mother and next friend, H. F.,
　and H. F.;

Plaintiff,

v.                                                    Civil Action No. 3:07CV223

CHESTERFIELD COUNTY SCHOOL BOARD, ET AL,

Defendants.

## MEMORANDUM IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

COME NOW the defendants, Wanda Moffett and Ann Minguzzi, in their individual and

official capacities, by counsel, and in support of their Motion for Summary Judgment, state as

follows:

### Nature of the Case

In this lawsuit, H.H. a young child with severe cognitive and physical limitations, and her

mother, H.F., have sued the Chesterfield County School Board ("School Board"), School

Superintendent Marcus Newsome, Special Education teacher Wanda Moffett ("Moffett"), and

teacher's aide Ann "Michele" Minguzzi ("Minguzzi"), claiming that H.H. was "grossly

neglected and abused" by Moffett and Minguzzi when H.H. was a student at O. B. Gates

Elementary School ("Gates") during the 2005/2006 school year.  The lawsuit also claims that

Moffett and Minguzzi violated H.H.'s Fourteenth Amendment liberty interest by "causing H.H.

to be strapped down and restrained unnecessarily in her wheelchair for long periods of time" and

that they falsely imprisoned and intentionally inflicted emotional distress on H.H. because of the

alleged unnecessary restraint.  The lawsuit further claims that the School Board discriminated against H.H. in violation of Section 504 of the Rehabilitation Act and discriminated and retaliated against H.H. and H.F. in violation of the Americans With Disabilities Act.

The only evidence which H.F. and H.H. claim supports these allegations are three recordings which were made surreptitiously and illegally, in violation of Federal and State Law, when H.F. hid a recording device under H.H.'s wheelchair on April 18, 19, and 20, 2006 (See 18 U.S.C. § 2510 et. seq. and Va. Code § 19.2-61 et. seq.).  Those recordings are inadmissible pursuant to 18 U.S.C. § 2515.  Nevertheless, the content of the recordings directly contradicts the claim that H.H. was "grossly neglected" or "abused."[1]

The evidence in this case, established by affidavit testimony and school records, is that during the course of the 2005-2006 school year H.H.:  (i) consistently received instruction, therapy and training from Moffett, Minguzzi, and numerous other School Board employees at Gates; (ii) was treated with care, concern, attention and affection; (iii) rather than being "strapped down" or "restrained" for "long periods of time," was frequently engaged in floor play, therapy sessions, group exercises and other activities which allowed her a free range of motion outside of her wheelchair; (iv) was only in her wheelchair during the portion of the day when it was required for her instruction or her physical safety; and (v) was restrained only by a lap belt when she was in her wheelchair.[2]

---

[1] Significantly, Minguzzi, who allegedly "abused" H.H. during this three-day time period, was not even working in the same classroom where H.H. was a student.  Minguzzi had been reassigned to another classroom a month earlier because of a reduction in the number of students in H.H.'s class due to illness and transfers.

[2] The lap belt had been installed on H.H.'s wheelchair for her personal safety by H.F. and was used by H.F. to safely transport H.H. to school in the morning and pick her up in the afternoon. H.H.'s wheelchair was specifically designed for H.H. by a wheelchair specialist chosen by Pat Bruker, H.H.'s physical therapist.  (Hammond ¶ 3).

For these reasons, Moffett and Minguzzi move the Court for entry of summary judgment in their favor on all claims brought against them.

<u>**Statement of Facts**</u>

The School Board operates 60 elementary, middle and high schools serving a student population in the 2005/2006 school year of approximately 56,750 students.  Gates was first opened for the 1983/1984 school year and, from the outset, has been a "magnet" or "catchment" school that serves not only general education students but also students with a wide range of special needs and disabilities.  For example, Gates provides special programs in the following discreet areas:

1. learning disabilities ("LD")
2. severe disabilities (significant cognitive and/or physical limitations; "SD")
3. emotional disabilities ("ED")
4. preschool special ed ("developmentally delayed")
5. hearing impaired
6. autism
7. intensive day program (severe emotional and physical disabilities)
8. mild mental disability (MIMD)
9. moderate mental disability (MOMD)



(Shane Aff. ¶¶ 3-4)

Gates provides instruction for students from kindergarten through fifth grade.  In addition to 700 regular education students who were assigned to Gates by geographic district, approximately 200 elementary school-aged special education students attended Gates in 2005/2006.  As a "magnet" school for special needs students, Gates accepts students from many other elementary attendance zones in the southern part of Chesterfield County.  Gates has 23 classrooms specially outfitted to serve the needs of special education students.  Approximately

28 special education teachers, 29 special education aides and 7 special education therapists work at Gates providing services to special education students.  (Shane Aff. ¶¶ 5-6)

In 2005/2006, Marguerite Christian Elementary School was a "feeder" school for Gates and provided a special early development program for young developmentally delayed children beginning at age 2 until kindergarten.  H.H. attended Marguerite Christian for three years beginning with the 2002/2003 school year.  H.H. transitioned to Gates at the beginning of the 2005/2006 school year when she "aged-out" of the early childhood development program at Marguerite Christian.  (Shane Aff. ¶ 7)  Moffett was H.H.'s  kindergarten teacher at Gates and Minguzzi served as a teacher's aide ("instructional assistant") in Moffett's classroom for a portion of the 2005/2006 school year. (Moffett Aff. ¶ 3; Minguzzi Aff. ¶¶ 3-4)  Moffett's special education room contained windows to the interior hallway and had two large windows to an outside corridor used by staff and children throughout the school day.  (Moffett Aff. Ex. G)

In accordance with the requirements of the federal "Individuals with Disabilities Education Act" ("IDEA"), each child with special needs in Chesterfield County is provided services consistent with an Individual Education Plan ("IEP").  H.H. had received services in accordance with a preschool IEP agreed to by H.F. and school officials at Marguerite Christian. At the close of H.H.'s preschool education at Marguerite Christian, H.F. was in the process of negotiating an IEP for H.H.  However, school officials found it impossible to gain H.F.'s approval of any reasonable IEP for H.H. because H.F. would not recognize the physical and intellectual limitations of H.H.   H.F. insisted that H.H. be provided educational services that were beyond her capabilities and, therefore, inappropriate for her.  As a result of these educationally unreasonable demands, H.F. never agreed to an IEP for H.H., and throughout the 2005-2006 school year, the only approved IEP for H.H. was the IEP that was developed for the

previous year.   Nonetheless, Gates school officials provided H.H. with appropriate special education services for a kindergarten-aged student in accordance with the conclusions reached by specialists in H.H.'s final Marguerite Christian evaluation.  (Hammond Aff., ¶ 8; Shane Aff. ¶ 9; Spinks Aff. ¶ 5)

At Gates, H.H. was placed in a class with other severely disabled children, each of whom had an IEP reflecting their special needs.  Each school day was highly structured and followed a schedule with discreet times for various activities.  Other special activities were provided to H.H. on a weekly basis within this daily educational schedule.  (Moffett Aff. ¶ 4, Ex. A; Minguzzi Aff. ¶ 6; Stoots Aff. ¶ 5)  These school activities were at various times conducted on an individual, "one-on-one" basis with H.H.; with other special needs children or in a "mainstreamed" setting with other regular education students.

H.H.'s schedule included the following regular activities and a myriad of special services including:

a.      Physical therapy for approximately 60 minutes every two weeks in two separate sessions.  Physical therapy was designed to strengthen H.H.'s legs by trying to teach her how to walk using a special "gait" trainer and to "cruise" by standing upright and moving with her legs while supporting herself on furniture such as a table.  Physical therapy was always provided in a "one-on-one" session between H.H. and a specially licensed physical therapist employed by the School Board.  (Diverdi-Payne Aff. ¶¶ 4-6; Moffett Aff. Ex. M)

b.      Occupational therapy for 90 minutes every two weeks.  Occupational therapy was designed to improve H.H.'s fine motor skills in her upper extremities by trying to teach her how to feed herself and otherwise manipulate her hands and arms.    Occupational therapy was

provided in "one-on-one" sessions and while at lunch between H.H. and a specially licensed occupational therapist employed by the School Board.  (May Aff., ¶¶ 6-7)

     c.     Speech therapy for approximately one hour each school week.  Speech therapy consisted of teaching H.H. to make common verbal sounds with her mouth and tongue.  Speech therapy was provided to H.H. in either group or "one-on-one" sessions with a specially licensed speech therapist employed by the School Board.  During speech therapy H.H. was either in her own classroom and/or in the speech therapist's classroom.   During those sessions, H.H. was sometimes in her wheelchair and sometimes out of her wheelchair.  (Alcaraz Aff. ¶¶ 4-5)

     d.     Music training for 20 minutes each week, in which H.H. was encouraged to participate in singing children's songs and in playing simple musical instruments such as tambourines and bells.  Music training was provided by a licensed music teacher who was employed by the School Board.  H.H.'s music instruction was provided in group sessions with all of the students in H.H.'s class.  Sometimes students from other special education classes were also included in H.H.'s music training classes.  Music training sometimes took place in H.H.'s classroom and sometimes took place in the music teacher's own classroom.  (McLendon Aff. ¶¶ 4-7)

     e.     Library training for approximately 20 minutes each week, in which a licensed librarian employed by the School Board read nursery rhymes and stories to H.H. and the other children in her special education class and sometimes showed the children videotapes illustrating the stories which they had just heard. H.H.'s library instruction was provided in group sessions with all of the students in H.H.'s class.  At times, students from other special education classes were also included in H.H.'s library training classes.   During H.H.'s library training, H.H. also intermingled with regular education students who would meet and greet her and the other special

education students when they entered the library.  Library training always took place in the Gates

school library.  (Hill Aff. ¶¶ 4-7; Moffett Aff. Ex. E)

  f.  Physical education training for approximately 20-30 minutes each week, in which

a licensed physical education teacher employed by the School Board would supervise floor play

and other physical activity designed to strengthen H.H.'s legs and upper body.  Physical

education training was provided in group sessions with all of the students in H.H.'s class.

Sometimes students from other physical education classes were also included in H.H.'s physical

education training classes.  Physical education training usually took place in a special physical

education trailer, which contained large matted areas where the special education children could

play.  Occasionally, physical education training also took place in H.H.'s classroom, which also

contained matted areas where the students could play.  H.H. was not in a wheelchair during

physical education training.  (Buckley Aff. ¶¶ 3-5)

  g.  Art training for approximately 20-30 minutes each week, in which a licensed art

teacher employed by the School Board would supervise art projects by the children in H.H.'s

class.  Art training was provided in group sessions in H.H's classroom, except on occasions

when H.H.'s class would be combined with another special education class for art instruction,

when art instruction might take place in another special education classroom.  (Blackburn Aff.

¶¶ 3-4)

  h.  Hygiene instruction, consisting of

toilet training and other instruction on personal

grooming and cleanliness, which took place in

H.H.'s classroom three times per day every day

for at least fifteen minutes each time.  During



hygiene instruction, H.H. was not in her wheel-

chair.  (Moffett Aff., ¶ 9(A) and Exs. A and N; Minguzzi Aff., ¶ 6)

      i.     Floor play for approximately one hour each day, which occurred in H.H.'s

classroom and consisted of H.H. playing on floor mats in an area of the room reserved for her

special use, where H.H. was allowed to crawl and play with various toys which provided

auditory, visual and tactile stimulation.  H.H.'s 
floor play was supervised by Moffett, Minguzzi

or another aide, Dreama Stoots ("Stoots"), who

worked in Moffett's classroom for a portion of

the year.  (Moffett Aff.; ¶ 9(C) and Exs. A and J;

Minguzzi Aff. ¶¶ 6-9; Zawadzki Aff. ¶ 6)

      j.     Mobility activity for approximately 30 minutes each day, which was supervised

by Moffett or Minguzzi and was in addition to physical therapy.  Mobility activity consisted of

efforts to have H.H. walk in a special walker known as a "gait trainer" and generally took place

in the hallway outside Moffett's classroom.  (Moffett Aff. ¶ 7D and Exs. A and M; Minguzzi

Aff. ¶ 6)

      k.     Lunch, which took place for approximately 30 minutes each day in the school

cafeteria.  During lunchtime, H.H. ate lunch with all other kindergarten classes in Gates,

including both regular and special education classes.  H.H. frequently interacted with other

special education and regular education students during cafeteria time.  H.H. was supervised by

Moffett, Minguzzi and/or Stoots during cafeteria time.  (Moffett Aff. ¶ 9 and Exs. A and D;

Minguzzi Aff. ¶ 6, Waldrop Aff. ¶ 4)

l.      Recess, which took place for approximately 30 minutes each day.  Recess took place on the schoolyard, when weather permitted it, or in the same trailer where the physical education instruction took place when it did not.  When recess took place on the schoolyard, H.H. usually was in her wheelchair or standing or "cruising" at the play equipment.  She sometimes was out of her wheelchair, playing in a sandbox.  When recess took place in the



physical education trailer, H.H. was outside of her wheelchair engaging in floor play on mats designed for that purpose.  During recess, H.H. frequently interacted with other special education and regular education students.  H.H. was supervised by Moffett, Minguzzi and/or Stoots during recess time.  (Moffett Aff. ¶ 9(F) and Exs. A and O; Minguzzi Aff. ¶ 6; Crandol Aff. ¶ 9)

m.      Classroom group activity, which took place for approximately an hour and fifteen minutes each day in H.H.'s classroom.  Group activity consisted of reading and other activities to provide auditory, visual and tactile stimulation to H.H. and the other special education students in H.H.'s classroom.  Students from other regular education classrooms occasionally came to Moffett's classroom and read to H.H.  During classroom group activity time, H.H. was seated in a "Rifton" chair, a chair with a tray attachment specially adapted to provide upper body support for severely disabled children.  (Moffett Aff. ¶ 9(B) and Exs. A, K and L)



In order to sustain her claim, H.F. must prove that: (1) H.H.'s screaming increased from Marguerite Christian while at Gates; (2) H.H.'s screaming indicated distress or pain; and (3) that the screaming at Gates was proximately caused by the abusive actions of Minguzzi and Moffett. Similarly, H.F. has the burden of proving that: (1) the incidents of H.H.'s seizures increased from Marguerite Christian to Gates; (2) H.H.'s seizures were precipitated by abusive actions at school; and (3) that the seizures were proximately caused by the abusive actions of Minguzzi and Moffett. The history of H.H.'s experience at both Marguerite Christian and O.B. Gates proves quite the opposite.

## History of Screaming

H.H. was non-verbal and lacked expressive language skills at both Marguerite Christian and Gates. (Hammond Aff., Attachment A). As is evident from the audio recording procured by H.F., H.H.'s verbalizing consisted of "screaming, squealing, screeching or growling." (Parthemos Aff., Ex. A) Behavior such as squealing and screaming increased considerably her last year at Marguerite Christian. H.H.'s screaming became "more than usual and seemed to depend on her mood." (Hammond Aff., ¶ 5). Her teacher at Marguerite Christian, Dee Hammond, sometimes could reduce the incidence of screaming but there were other times when she could not calm H.H. (Hammond Aff., ¶ 5). "Sometimes nothing satisfied her." (Hammond Aff., ¶ 5). H.H.'s screaming and squealing continued unabated during her year at Gates.[3]

---

[3] Note, for example, the following observations from school officials: "H.H. screamed most of the time during therapy sessions." (Alcaraz Aff. ¶ 5). "H.H. almost always screamed or screeched during class." (Buckley Aff. ¶ 6). H.H. "tended to scream a lot." (Crandol Aff. ¶ 7). H.H. "frequently screamed or screeched during class." (Blackburn Aff. ¶ 5). H.H.'s "squealing and screaming occurred constantly throughout the day." (Zawadzki Aff. ¶ 4). "Although she screamed almost constantly, the screaming did not appear to be an indication that she was unhappy." (Hawthorne Aff. ¶ 7). During lunch "she [H.H.] usually would be making a high-pitched squeal." (Waldrop Aff. ¶ 6). "H.H. screamed or screeched most of the time on almost every day." (Stoots Aff. ¶ 6). "… from the beginning of the school year H.H. made noise by screaming, squealing and screeching for a large portion of each day." (Minguzzi Aff. ¶ 10).

According to H.F., H.H. screamed at home as well.  (Minguzzi Aff. ¶ 10).  Nor did the extent of

H.H.'s screaming change from the beginning of the school year at Gates to the end.[4]

### History of Seizures

H.H. experienced seizures while attending Marguerite Christian.  The seizures seemed to

increase her last year at Marguerite Christian, and were "longer in duration." Her teacher, Dee

Hammond, noted "H.H.'s last year was difficult due to the amount of seizures and excessive

absences …." (Hammond Aff. ¶ 5)  H.H. had been hospitalized during her time at Marguerite

---

"During music classes, H.H. would often scream for no apparent reason."  (McLendon Aff. ¶ 7).
"H.H. made loud, screaming noises most of the time when she was at school."  (McCole Aff.
¶ 9).  "During the group sessions, H.H. screamed constantly."  (Kirby Aff. ¶ 4).  "I observed
Wanda Moffett's classroom several times during the 2005-06 school year, when H.H. was a
student.  I remember that H.H. made a high shrill, ear-piercing sound.  From my office I could
often hear H.H. when Ms. Moffett's class was in the Cafeteria during lunch." (Hines Aff. ¶ 4).
"H.H. screamed almost constantly."  (Diverdi-Payne Aff. ¶ 6).  "H.H. screamed most of the time
when she was at school ….  Even from my office it was obvious when H.H. entered the building
because her screaming was so intense."  (Shane Aff. ¶ 11)

[4] Note, for example, the following observations from school officials:  "From the first of these
group sessions until the last of them, H.H. screamed a great deal."  (Gara Aff. ¶ 4).  "H.H. tended
to scream a lot during the school year from beginning to end" (Crandol Aff. ¶ 7).  "It seemed to
be no more or less frequent as the year progressed."  (Blackburn Aff. ¶ 5).  "the amount of
squealing also did not appear to change as the school year progressed." (Waldrop Aff. ¶ 6).  "I
saw no change in her screaming over the course of the year."  "It [screaming or screeching] got
neither better nor worse."  (Stoots Aff. ¶ 6).   "This behavior [screaming, squealing and
screeching] did not change over the school year."  (Minguzzi Aff. ¶ 10).  "I saw no downward
deterioration in H.H.'s behavior during the school year."  (McLendon Aff. ¶ 8).  "She made these
[screaming noises] consistently from the beginning of the school year until she left O.B. Gates in
April of 2006."  (McCole Aff. ¶ 9).  "I saw no improvement or deterioration in H.H.'s behavior
over the course of the school year.  H.H.'s screaming continued to be constant and unchanged
during this period of time." (Kirby Aff. ¶ 4).  "H.H. would yell from time to time and that stayed
the same throughout the year.  I recall no behavioral changes in H.H. either positive or negative
as the year progressed."  (Hill Aff.  ¶ 7).  I saw no change in H.H.'s behavior during the course
of the school year.  The screaming did not appear to get any worse or any better, and H.H.
appeared to me to be just as happy near the end of the school year when her mother removed her
from school as she had appeared to be at the beginning of the year."  (Hawthorne Aff. ¶ 7).
"H.H.'s affect, mood, fine motor skills and cognitive levels stayed the same from the beginning
of the school year to the end.  (May Aff. ¶ 10).  "I saw no improvement or deterioration in H.H.'s
behavior over the course of the school year."  (Gara Aff. ¶ 4).

Christian for some of her seizures that were longer in duration, but the doctors could find no reason for their occurrence. (Hammond Aff., Attachment A). H.H. was taking the medication Trileptal to control her seizures and a medical protocol had been established for the school nurse that if any of her seizures lasted more than 40 seconds, she would be administered Diastat rectally. (Id.)

H.H. continued to occasionally have small seizures her first year at Gates although they were infrequent and, unlike her time at Marguerite Christian, all the seizures were mild enough to be resolved at school. (McCole Aff. ¶ 8 and Attachment). H.H.'s aide, Minguzzi, only recalls one seizure that occurred after Christmas and that seizure was successfully treated at school. (Minguzzi Aff. ¶ 12) The frequency of seizures did not increase as the school year progressed (Stoots Aff. ¶ 7; McCole Aff. ¶ 8, Minguzzi Aff. ¶ 12), and the physical therapist did not observe any seizures in the latter part of the school year.[5] (Diverdi-Payne Aff. ¶ 8).

### H.H. Activities With Regular Education Students ("Mainstreaming" or "Inclusion")

H.H.'s significant cognitive and physical deficiencies coupled with her near-constant screaming made it educationally inappropriate to place H.H. in a regular or "mainstreamed" classroom. (Shane Aff., ¶ 9) Even though H.H. was placed in a classroom with other severely disabled students, Moffett and other educational specialists regularly found opportunities for H.H. to interact with general education students. During IEP meetings, H.F. had asked for more "mainstreaming" opportunities for H.H., including being placed in a regular kindergarten room. (Spinks Aff. ¶ 5)

---

[5] The notebook used by H.F. and school representatives to communicate back and forth during the school year reveals only one seizure in school, which took place on January 6. (Moffett Aff., Ex. B) The notebook also shows that between November and February, H.H. experienced increased incidents of seizures at home generally while she was sleeping. Her doctors adjusted her medication and there is no further mention of ongoing seizures in the notebook after February. (Moffett Aff., Ex. B).

In light of the concerns expressed by H.F., Moffett and a regular kindergarten teacher, Nancy Helms Spinks, discussed possible additional mainstreaming opportunities that would be consistent with H.H.'s disabilities.  (Spinks Aff. ¶ 5)  Those opportunities for mainstreaming took a number of forms:

Each day at 11:00 H.H. would be trained in walking using a gait trainer or transported from one classroom to another in the hallways where she could pass by and experience other students. (Minguzzi Aff. ¶ 6)  Similarly, physical therapy sessions were sometimes conducted in school hallways.  (Diverdi-Payne Aff. ¶ 6)  H.H. also accompanied Moffett as she went to the school office to drop off attendance records.  (Gara Aff. ¶ 6)  Each day H.H. had lunch with the general student population in the cafeteria.  (Minguzzi Aff., ¶ 6; Waldrop Aff. ¶ 4).  Outdoor recess for H.H. always involved regular students (Spinks Aff. ¶ 6; Crandol Aff. ¶ 9) Moffett took H.H. to school assemblies and other classrooms to be read to.  (Zawadzki Aff. ¶ 5; McCole Aff. ¶ 7; Moffett Aff., ¶ 9E)  H.H. also had a fifth grade student assigned to her as a daily greeter. (Moffett Aff., ¶ 9E).

Many other people at Gates worked to integrate H.H. into group settings with other students, whether regular education or special needs.  (Crandol Aff. ¶ 8)  Although "… Moffett was always trying to integrate H.H. into larger group settings there was some resistance because some teachers felt that H.H.'s screaming was too disruptive." (Zawadzki Aff. ¶ 5)  The amount of mainstreaming that H.H. received in the 2005/2006 school year was consistent with her educational and behavioral capabilities (Shane Aff. ¶ 9; Moffett Aff. ¶ 10; Spinks Aff. ¶ 6).

### H.H's Activities Outside of Her Wheelchair

Observations by many people confirm that while in Moffett's classroom. H.H. was frequently out of her wheelchair when involved in a variety of activities.  (See, e.g., Hill Aff. ¶ 8,

McCole Aff. ¶ 6, Waldrop Aff. ¶ 8, Zawadzki Aff. ¶ 6, Minguzzi Aff. ¶ 6 and ¶ 9; Gara Aff. ¶ 5, Stoots Aff. ¶ 5; Hawthorne Aff. ¶ 6, Hines Aff. ¶ 4, May Aff. ¶ 7, Shane Aff. ¶ 10.)  Those daily or weekly activities included:   using a special matted area which Moffett had specifically designed for H.H.;[6] receiving hygiene/toilet training, while in a gait trainer, while "cruising" in her walker, "free roaming" on the floor and during play time, ball activity and resting.

H.H. was also out of her wheelchair at other times when with other students outside Moffett's classroom.  For example, H.H. was never in her wheelchair during physical therapy sessions (Diverdi-Payne Aff. ¶ 5 and ¶ 7) and was on the mats while in the physical education trailer (Gara Aff. ¶ 5, Kirby Aff. ¶ 5, Buckley Aff. ¶ 5).   During speech therapy she was sometimes on the classroom mats.  (Alcaraz Aff ¶ 4).   During recess when the weather was appropriate, H.H. would sometimes play in a sandbox or stand or "cruise" at the playground equipment.  ( Moffett Aff., ¶ 9(F))[7]

## Legal Argument

### 1.   Standard of Review

Motions for summary judgment must be granted if evidence established by the pleadings, affidavits and exhibits shows that there is no genuine issue as to any material fact and that the moving party should prevail as a matter of law.  Celotex v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[6] Moffett designed this special motor mat area with input from H.H.'s therapists and with approval from the school principal and School Board special education liaison.  It contained useful visual and auditory stimulation such as a music box and squeaking toys.  H.H. would observe a light box in front of her face for visual stimulation. (Zawadzki Aff. ¶ 6, May Aff., ¶ 8; Moffett Aff. ¶ 12(H)).  Minguzzi had painted a palm tree and beach scene on the mirror on the wall in the matted area.  She had also hung "smiley faces" and design patterns on the wall because H.H. had shown an interest in them.  Minguzzi would sometimes climb into the matted area to play with H.H.  (Minguzzi Aff. ¶¶ 6, 9)

[7] Normally, if someone is confined to a wheelchair, there would be pressure sores and open wounds.  H.H. had none of the physical signs of being confined to a wheelchair. (Zawadzki Aff., ¶ 7)

When confronted with credible evidence, the non-moving party must reply with a sufficient factual showing concerning an essential element of the case in order to avoid summary judgment.  Id.  This case is ripe for disposition on summary judgment because the relevant facts of the case establish that the defendants Moffett and Minguzzi gave H.H. appropriate care and educational services and neither abused nor inappropriately restrained H.H.   The audio recordings on which H.F. and H.H. rely in this case were both illegally obtained, and therefore inadmissible, and also unsupportive of the factual contentions made in the Complaint.

   2.   **The audio recordings which H.F. made without the permission or knowledge of any parties to the conversations cannot assist the plaintiffs in surviving summary judgment.**

   The only evidence which the plaintiffs purport to have in support of their lawsuit is audio recordings made over the course of three school days on April 18, 19, and 20, 2006.  (Parthemos Aff., Ex. A)   On those days, H.F., without permission or authorization and without the knowledge of Moffett, Minguzzi or any Chesterfield County School Board official or employee, had hidden a recording device on H.H.'s wheelchair so that she could eavesdrop on conversations among School employees.

   a.   **The audio recordings which H.F. made were without the permission or knowledge of any of the parties to the conversation and are inadmissible.**

   The Federal Wiretapping Act, 18 U.S.C. §2510 et. seq. expressly prohibits any individual from intercepting the contents of any communication.  18 U.S.C. § 2511(a).  The Act further prohibits the introduction into evidence of the contents of any communication which was intercepted in violation of the Act.  18 U.S.C. §2515.  Accordingly, the audio recordings which H.F. intercepted when she surreptitiously hid the recording device on H.H.'s wheelchair are not

admissible in this case unless the plaintiffs can establish that the recording of the conversations was permitted by an exception to the Act.

One of the exceptions to the prohibition against wiretapping conversations permits the interception of a communication when one of the parties to the communication has consented. 18 U.S.C. § 2511 (2)(d).  Although it is undisputed that no party to the recordings which H.F. made in this case ever consented to them being recorded, the plaintiffs argue in their Complaint that the recordings were justified under the "vicarious consent" doctrine, which allows a parent to "consent" on behalf of her child to intercept conversations to which the child is a party.  The doctrine only applies if the parent can demonstrate a good faith, objectively reasonable basis for believing that the recording was necessary for the welfare of the child.  See, e.g., Pollock v. Pollock, 154 F.3d 601 (6th Cir. 1998); Thompson v. Dulaney, 838 F. Supp. 1535 (D. Utah 1993).[8]

The "vicarious consent" doctrine does not justify this illicit recording because H.F. cannot demonstrate a good faith, objectively reasonable basis for believing that H.H.'s welfare required her to use a hidden recorder to eavesdrop on conversations.  In her Complaint, H.F. claims that she was justified in making the recordings for two reasons.  First, she contends that as the school year progressed, H.H. became increasingly more agitated and anxious when being driven to school in the morning and displayed similar behavior when she was picked up from school in the evening, and that this behavior, which contrasted with her "happy and peaceful" behavior in the Chesterfield County pre-school program, subsided when she returned home. (Complaint ¶ 18)  Second, she claims that H.H. experienced a "sharp increase in seizures as the school year progressed. (Complaint ¶ 19)

---

[8] The Fourth Circuit has never adopted the "vicarious consent" doctrine, but many federal courts have adopted it, and there are no reported cases in which a federal court has rejected it.

H.H.'s contentions are directly contradicted by the evidence in the case.  Moffett and H.F. jointly kept a contemporaneous notebook of H.H.'s behavior throughout the school year. The notebook shows no pattern of H.H. being increasingly anxious or agitated at school as the year progressed.  (See Moffett Aff., Ex. B)  Rather, the notebook shows that H.H.'s mood was sporadically happy and sporadically unhappy over the course of the year, and that there was no pattern to her mood.[9]   The contemporaneous entries in the notebook are consistent with the observations of teachers who provided service to H.H. throughout the course of the school year that H.H.'s moods were unpredictable and remained unpredictable from the beginning of the school year to the end.  (See, Footnotes 3 and 4).

H.F.'s claim that H.H.'s behavior at Gates was markedly worse than when she was in the pre-school program at Marguerite Christian is also not supported by the contemporaneous record.  The contemporaneous records from Marguerite Christian, and the affidavit of her teacher there, establish that H.H.'s moods, and her behavior in general, began to worsen markedly in H.H.'s final year at Marguerite Christian, as she approached school age, something that is not uncommon with severely disabled children.  (See Aff. of Hammond, ¶¶ 4-7)  The notebook, and the contemporaneous notes of the school nurse, Mary McCone, also contradict H.F.'s claim that

---

[9] The notebook also belies H.F.'s claim that H.H.'s anxiety subsided when she returned home. For example, when H.H. returned to school after Christmas break, H.F. remarked on January 4 that H.H. was glad to be back in school.  As the year progressed, notes of school employees on February 3, 9, 17 and March 22 all memorialize times when H.H. had "happy days" at school, while H.F.'s notes of February 27, March 6, 9 and 27 reveal periods when H.H. was unhappy at home.  Contrary to H.F.'s claim, the notebook does not reveal a discernible pattern in H.H.'s school behavior.  It demonstrates a short term decline in late March, while H.H. adjusted to new medications after a hospital visit and while H.H. experienced teething pain, but by March 31, H.H.'s behavior had improved to the point that H.F. indicated she may have "broken the cycle." On balance, H.H.'s changes in mood support the observation made by H.F. on January 31, that H.H. was "a direct decendant [sic] of Jeckyl [sic] and Hyde."  (Moffett Aff. Ex. B)

H.H. experienced an increase in her seizure activity at school as the year progressed.[10]  The notebook, and the nurse's notes, show occasional seizure episodes during the year, but they do not show an increase in seizure activity as H.F. now alleges.  (Moffett Aff. Ex B; McCole Aff., Attachment)[11]

Courts that have applied the vicarious consent doctrine have stressed that it should not be applied to allow parents to "tape any conversation involving their child simply by invoking the magic words: 'I was doing it in his/her best interest."  Instead, it should only be applied where there is objectively reasonable evidence of a compelling need "such as verbal, emotional or sexual abuse by the other parent …"  Pollock 154 F.3d at 610.  Since the only justifications which H.F. has advanced to support her claim that the recording was legally permissible are conclusory allegations which are contradicted by the actual evidence, H.F. cannot make a showing of a compelling need that is necessary to justify application of the "vicarious consent" doctrine.

On its face, the "vicarious consent" doctrine also cannot apply to any portion of the recordings which involve conversations exclusively between school employees because, unlike in any of the reported "vicarious consent" cases, H.H. was not herself a party to those conversations.  Since the "vicarious consent" doctrine merely permits a parent to consent on behalf of the child to the recording of a conversation to which the child is a party, it necessarily follows that the doctrine cannot be applied when the child is not herself a party to the

---

[10] H.F. also fails to offer any medical explanation as to why it would be medically reasonable for her to suspect that H.H. had been mistreated at school, even if an increase in seizure activity had occurred.  In fact, the notebook indicates that her doctors treated her seizure activity with medication, indicating a medical cause for the seizures, not abuse.  (Moffett Aff. Ex. B, entries of 2/27, 2/28 and 3/9; McCole Aff., Attachment)

[11] The notebook does reveal a short term increase in seizure activity at home, during sleep from November until early March.

conversation.  In fact, Moffett and Minguzzi have found no case in which a Federal Court has permitted the vicarious consent doctrine to be applied except when the child is herself a party to the conversation.

> **b.     The audio recordings reveal no evidence of wrongdoing on the part of anyone.**

The essence of H.F. and H.H.'s claim is contained in their allegation that the recordings show that H.H. was kept "unnecessarily strapped and restrained in her wheelchair for hours at a time" (Complaint ¶ 25(a)) and that Moffett, Minguzzi and others "provided H.H. with little or no services, activities or programs. (Complaint ¶ 25(b)).[12]

Yet irrespective of these conclusory allegations, the recordings themselves offer no support for the allegations.  Since there is no video to go with the recordings, one cannot see where H.H. is located when listening to the recordings and must, therefore, rely only on the sound on the tape to try to determine where she is.  Due in part to the poor quality of the sound recording and in part to the fact that, for safety reasons, H.H. was never allowed to be taken far from her wheelchair (Moffett Aff. ¶ 7) it is impossible to tell from the recordings whether H.H. is in her wheelchair, in some other piece of equipment, crawling on the floor or in one of the matted areas which Moffett had made for her in her classroom at any particular time.

The inability to determine H.H.'s location during the taping can be demonstrated by one example:  at the 06:23:40 mark of the April 18 recording, one can hear school employees

---

[12] The plaintiffs offer no explanation as to how the tapes, which were made on April 18, 19 and 20, 2006, could possibly show any improper conduct on the part of Minguzzi at all, since Minguzzi was transferred away from Moffett's classroom in March of 2006 and was no longer responsible for any aspects of H.H.'s care and education in April of 2006.  Moreover, as the contemporaneous notebook entry for March 23 demonstrates, H.F. was well aware of the fact that Minguzzi was no longer working in H.H.'s' classroom:  "Any word on getting Michele [Minguzzi] or Dreama [Stoots] back now that [H.H.] is back?  I can see why they pulled them

remarking how heavy H.H. is (in an apparent indication that they have lifted her up, either from her wheelchair, some other piece of equipment, or off the floor), followed by school officials coaxing H.H. to walk and praising her when she attempts to do so.  Yet when comparing that one portion of the recording, when H.H. is obviously not in her wheelchair, to other portions, it is impossible to tell any difference in sound quality which would allow a listener to determine where H.H. is located at other times during the recording.  The listener only knows that H.H. is not in the wheelchair because one can hear that she is being coaxed to walk.

Similarly, in spite of the poor quality of the recordings, there are many examples of times when one can tell that H.H. is receiving services or interacting with other children.  For example, on April 18 alone at 2:09:40, 3:10:00, 4:55:00 and 5:25:00, H.H. is obviously receiving services, based on the interaction by others with her.

The recordings also fail to support the allegations of the Complaint because they were taken not only over a short period of time, but also over a period of time that was not representative of H.H.'s normal school activities.  As the affidavits establish, H.H. was originally in a class of six students, but due to illness and transfer, by March, there were only two students regularly attending class in the room.  (Moffett Aff. ¶ 3)  The Complaint itself asserts (correctly) that the other student who was normally present in the class was himself absent from school due to sickness on two of the three days when the recordings were made, leaving H.H. as the only student in the classroom.  Moreover, on one of the three days, April 19 (which also happened to be the day when H.F. met with school officials to go over H.H.'s IEP), school records show that H.H. went to receive speech therapy early in the day, but was unable to complete the therapy session because she vomited and had to be taken to the nurse's station.  H.H. remained too ill to

---

w/only Manny & [H.H.] in the class – but aren't Max & Josh still enrolled?"   (Moffett Aff. Ex. B)

return to class until 1:30, when the IEP session was concluded, at which time H.F. took her home.  (Alcaraz Aff. ¶6; Attachment; McCole Aff., Attachment)   Accordingly, efforts were made to provide H.F. with services on that date but due to H.H.'s illness, the services could not be completed.

> ### 3.   There is no evidence to support a claim that H.H. was subjected to unnecessary restraints in violation of her liberty interests.

The plaintiffs claim that H.H's "liberty interests" were violated because she was "strapped down and restrained unnecessarily in her wheelchair for long periods of time." This is a substantive due process claim under the Fourteenth Amendment.  Doe v. S & S Consolidated I.S.D. 149 F.Supp. 2d 274 (E.D. Tex. 2001).  Such a claim is not cognizable unless the plaintiff can establish that the behavior complained of is not rationally related in any manner to a legitimate governmental interest.  Fonner v. Fairfax County, Va., 415 F.3d 325, 332 (4th Cir. 2005).  The behavior must be so egregious as to "shock the conscience."  Doe v. S & S Consolidated I.S.D., 149 F.Supp 2d at 295.

In this case, the evidence establishes that the only restraint placed on H.H. was a lap belt which was used when she was in her wheelchair.[13]  This lap belt was necessary for H.H.'s safety because she could not control her body trunk and could have fallen out of her chair unless she used a lap belt (May Aff., ¶ 10) H.H.'s mother, H.F., also used the lap belt when H.H. was in her wheelchair. In fact, H.F. had actually worked with the physical therapist at Marguerite Christian to modify the wheelchair to add the lap belt to it.  The evidence also establishes that H.H. was out of her wheelchair for much of the school day, such as when she was engaged in hygiene training, circle time, floor play, physical therapy and physical education training, and that she

---

[13] On rare occasions, when H.H. thrashed around with her upper body, an additional chest restraint was placed on H.H. for a brief period to keep her from injuring herself.  One such episode was cataloged in the notebook on February 24.   (See also Minguzzi Aff. ¶ 7)

was only in her wheelchair when it was necessary for instruction, such as for Music, Library, and Art.   Accordingly, the use of the lap belt in H.H.'s wheelchair was rationally related to the legitimate governmental interest of instructing H.H. in a safe environment where she was not at risk of injury from falling out of her wheelchair. Accordingly, under the substantive due process standard of Fonner, H.H.'s Fourteenth Amendment rights were not violated in this case.

Although there are no reported Fourth Circuit "liberty interest" cases in the school setting, other than corporal punishment cases that are not relevant to the plaintiffs' claim, case law from other courts establish that the claims do not support a Fourteenth Amendment substantive due process liberty interest claim.   For example, placing a special education student in solitary confinement in an "in school suspension room" for three days, while depriving him of access to his teachers and instructional materials, has been deemed not to be a substantive due process violation, Wise v. Pea Ridge School Dist., 855 F.2d 560 (8th Cir. 1988); and completely restraining an elementary school student by wrapping her in blankets to keep her from harming herself or others was also ruled not to be a Fourteenth Amendment violation. Heidemann v. Rother, 84 F.3d 1021 (8th Cir. 1996); Doe v. Consolidated I.S.D., 149 F.Supp. 2d at 291.   See also Hassan v. Lubbock Ind. School Dist., 55 F.3d 1075 (5th Cir. 1995).[14]

### 4.   Moffett and Minguzzi are entitled to qualified immunity against the claim that they violated H.H's constitutional liberty interest.

Qualified immunity shields public officials such as Moffett and Minguzzi from liability unless a reasonable person would have known that her conduct violated H.H.'s clearly

---

[14] Even when a teacher strapped a second grade student to a chair for one entire school day, except lunch hour, and for protracted parts of a second day, by securing her with jump rope around her waist and legs, the Court of Appeals would have been prepared to find the restraint reasonable if the defendants could have provided a justification "such as punishment or discipline."   However, since no justification was provided by the defendants, the restraint was

established statutory or constitutional rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  If the propriety of the official's actions is at least debatable, then the official is entitled to the protection of qualified immunity.  Anderson v. Creighton, 483 U.S. 635, 640-41 (1987).

In determining whether or not to apply immunity to a particular case, courts are required to engage in a two-step inquiry.  Saucier v. Katz, 533 U.S. 194 (2001).  First, courts must determine whether "the facts alleged show the [official's] conduct violated a constitutional right."  Id. at 201.   If no constitutional right was violated, then the inquiry ends and the plaintiff cannot prevail.  However, if a constitutional violation is properly alleged, courts must then determine "whether the right was clearly established… in light of the specific context of the case, not as a general proposition."  Id.

The case law discussed in Section Two of this Memorandum establishes that Moffett and Minguzzi did not violate H.H.'s liberty interest rights because they did not unnecessarily restrain or restrict H.H.'s movement but, instead, only used the lap belt--already fitted into her wheelchair by her mother--during the periods of time when she was seated in the wheelchair in order to protect H.H.'s personal safety.  Accordingly, by law, H.H.'s liberty interest rights were not violated and the plaintiffs cannot satisfy the first step of the two-step Saucier analysis.

The Plaintiffs also cannot pass the second step of the Saucier test, since it was reasonable for the defendants to believe that since the only restraints they placed on H.H. were for her own physical safety, they were constitutionally compelled to use the lap belt to restrain her when she was in her wheelchair for her own safety.  Heidemann, supra; Doe, supra.

---

found to be unconstitutional.  Jefferson v. Ysleta Independent School Dist., 817 F.2d 303 (5th Cir. 1987).

**5.      Minguzzi and Moffett did not falsely imprison H.H. because they were authorized to use the lap belt on her wheelchair as necessary to protect H.H.'s safety.**

Under Virginia law, a person is falsely imprisoned if he restrains a person's liberty without authority to do so. Zayre of Va., Inc. v. Gowdy, 207 Va. 47 (1966). There are no reported Virginia cases which establish what constitutes "authority" for restricting the freedom of a student in a school setting. However, when a parent enrolls her child in a school in which she knows that some restraints will be placed on her child, the parent has authorized the restriction and the restraint cannot be a false imprisonment. Woods v. Wills, 400 F. Supp.2d 1145 (E.D. Mo. 2005). In this case, H.F. herself placed the lap belt on H.H.'s wheelchair and used it when she transported H.H. to and from school every day. Accordingly, the use of the lap belt cannot be a false imprisonment.

Schools have an affirmative constitutional obligation to provide a safe environment for school students. See, e.g., Mitchell v. Board of Trustees of Oxford Municipal Separate School Dist., 625 F.2d 660, 664-65 (5th Cir. 1980); Heidemann and Hassan, supra. As previously explained, use of the lap belt was also necessary to protect H.H.'s safety, since she was unable to support her upper body while in a seated position in her wheelchair without it. For example, H.H. sometimes thrashed her upper body, at lunch or during movie time which required extra upper body restraint to keep H.H. from hurting herself. School officials, who have the discretion to determine the proper method for educating, protecting and disciplining students, cannot be guilty of false imprisonment when they determine that a student such as H.H. needs to be seated in her wheelchair to receive proper instruction and cannot be safely seated without her lap belt restraint. See, e.g.., Harris v. County of Forsyth, 921 F.Supp. 325 (M.D. N.C. 1996).

**6.     Moffett and Minguzzi did not intentionally inflict emotional distress on H.H because the actions which they took were reasonably taken in their discretion to further H.H.'s education.**

Under Virginia law, a defendant may only be found guilty of intentional infliction of emotional distress if she engages in intentional behavior that is outrageous and intolerable and causes severe emotional distress to another person. Russo v. White, 241 Va. 23,26-27, 400 S.E. 2d 160, 162-63 (1991). In this case, the only behavior which Moffett and Minguzzi engaged in was behavior which they reasonably believed was necessary to protect H.H.'s safety. As a matter of law, that behavior could not have been "outrageous" or "intolerable." Accordingly, the plaintiffs' intentional infliction of emotional distress claim must be dismissed.

**7.     The plaintiffs' claims against Moffett and Minguzzi in their official capacity are duplicative of their claims against the School Board and, accordingly, they should be dismissed.**

Official capacity claims against individual defendants are "only another way of pleading an action against an entity [the School Board] of which an officer [or employee, such as Moffett or Minguzzi] is an agent." Monell v. New York City Dept. of Social Services,  436 U.S. 658, 690 n.55 (1978). Since the School Board is a party to this lawsuit and has responded to it, the suit against Moffett and Minguzzi in their official capacity is "in all respects other than name, to be treated as a suit against the entity [the School Board]."[15] Brandon v. Holt, 469 U.S. 464, 471-72 (1985). The plaintiffs cannot recover damages against Moffett and Minguzzi "in their official capacity" and must look to the entity itself, the School Board, for any damages which they claim against them "in their official capacity."  Kentucky v. Graham, 473 U.S. 159, 166 (1985). Accordingly, the plaintiffs' official capacity claims against Moffett and Minguzzi are duplicative

---

[15] The first three counts of the lawsuit, which attempt to make claims based on the ADA and the Rehabilitation Act, make no claim against Moffett and Minguzzi. Counts four through six which allege a liberty interest violation and the state torts of false imprisonment and intentional infliction of emotional distress are brought against all Defendants.

of their claims against the School Board and must be dismissed.  Love-Lane v. Martin, 355 F.3d

766 (4th Cir. 2004)

### Conclusion

Over 21 professional educators who participated in the education of H.H. observed

Moffett and Minguzzi caring for H.H. during the 2005/2006 school year and never saw either

Moffett or Minguzzi abuse H.H. physically, verbally, emotionally or in any other way.  H.H.

spent substantial time out of her wheelchair every day when she was at school and she frequently

interacted with other special education and regular education students.   Both the

contemporaneously recorded diary and the illegally obtained audio recordings confirm that no

abuse occurred.  Accordingly, for the reasons stated in the memorandum, Moffett and Minguzzi

ask the Court to grant their Motion for Summary Judgment.

WANDA MOFFETT and
ANN MINGUZZI


By:     /s/ Steven L. Micas_____
        Steven L. Micas
        Virginia State Bar Number 13431
        Attorney for Wanda Moffett and
          Ann Minguzzi
        Chesterfield County Attorney
        P. O. Box 40
        Chesterfield, Virginia 23832
        Telephone   (804) 748-1491
        Facsimile   (804) 717-6297
        micass@chesterfield.gov

Steven L. Micas, VSB 13431
County Attorney
Stylian P. Parthemos, VSB 17360
Senior Assistant County Attorney
P. O. Box 40
Chesterfield, VA  23832
Telephone   (804) 748-1491
Facsimile   (804) 717-6297

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2007, I will electronically file the foregoing Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (FEF) to the following:

William H. Hurd
Attorney for H.H. and H.F.
TROUTMAN SANDERS LLP
1001 Haxall Point
P. O. Box 1122
Richmond, VA   23219
Telephone (804) 697-1335
Facsimile (804) 698-6058
William.hurd@troutmansanders.com

D. Patrick Lacy, Esquire
Kathleen S. Mehfoud Esquire
Attorneys for Chesterfield County School Board
 and Marcus J. Newsome
ReedSmith, LLP
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1700
Richmond, VA 23219

/s/ Steven L. Micas
Steven L. Micas
Virginia State Bar Number 13431
Attorney for Wanda Moffett and
   Ann Minguzzi
Chesterfield County Attorney
P. O. Box 40
Chesterfield, Virginia 23832
Telephone   (804) 748-1491
Facsimile   (804) 717-6297
micass@chesterfield.gov

**ATTACHMENT**

### Statement of Undisputed Facts

1.     At Gates, H.H. was placed in a class with other severely disabled children.  Each school day followed a schedule with discreet times for various activities.  Moffett was her teacher.  Minguzzi and Stoots were aides in the class from September to March of 2006 but not after March. (Moffett Aff. ¶¶  4, 9D, Ex. A; Minguzzi Aff. ¶¶ 4- 6; Stoots Aff. ¶¶  4-5)

2.     H.H.'s schedule included physical, occupational and speech therapy, music, art, physical education, and library instruction, as described in the affidavits of the therapists and instructors who provided those services. (Diverdi-Payne Aff. ¶¶ 4-6; May Aff., ¶¶ 6-7; Alcaraz Aff. ¶¶ 4-5; McLendon Aff. ¶¶ 4-7; Hill Aff. ¶¶ 4-7; Buckley Aff. ¶¶ 3-5; Blackburn Aff. ¶¶ 3-4)

3.     H.H.'s schedule included hygiene instruction, floor play, mobility activity, lunch, recess and group activity as described in Moffett's and Minguzzi's affidavits.  (Moffett Aff., ¶ 9; Minguzzi Aff., ¶ 6)

4.     H.H.'s moods and behavior began to worsen markedly in H.H.'s final year at Marguerite Christian something that is not uncommon in severely disabled children as they approach school age. Behavior such as squealing and screaming increased considerably H.H.'s last year at Marguerite Christian.  H.H.'s screaming became "more than usual and seemed to depend on H.H.'s mood."  (Hammond Aff. ¶¶ 4-7).

5.     H.H.'s screaming and squealing continued unabated during her year at Gates and did not change from the beginning to the end of the school year. (Alcaraz Aff. ¶ 5; Buckley Aff. ¶ 6; Crandol Aff. ¶ 7; Blackburn Aff. ¶ 5; Zawadzki Aff. ¶ 4; Hawthorne Aff. ¶ 7; Waldrop Aff. ¶ 6; Stoots Aff. ¶ 6; Minguzzi Aff. ¶ 10; McLendon Aff. ¶¶ 7-8; McCole Aff. ¶ 9; Kirby Aff. ¶ 4; Hines Aff. ¶ 4; Diverdi-Payne Aff. ¶ 6; Shane Aff. ¶ 11; Gara Aff. ¶ 4; Hill Aff.  ¶ 7; May Aff. ¶ 10.)

6.      H.H. experienced seizures while attending Marguerite Christian.  The incidence and duration of these seizures increased her last year there. (Hammond Aff. ¶ 5)

7.      H.H. continued to occasionally have small seizures her first year at Gates.  They were infrequent, mild enough to be resolved at school, and did not increase in frequency or severity during the school year.  (McCole Aff. ¶ 8 and Attachment; Stoots Aff. ¶ 7; Minguzzi Aff. ¶ 12; Diverdi-Payne Aff. ¶ 8).

8.      H.H. received services in accordance with a preschool IEP from Marguerite Christian.  School officials could not gain H.F.'s approval of a kindergarten IEP for H.H..  Accordingly, the only approved IEP for H.H. throughout the 2005/2006 was the one from Marguerite Christian.   Nonetheless, Gates school officials provided H.H. with appropriate special education services for a kindergarten-aged student in accordance with the conclusions reached by specialists in H.H.'s final Marguerite Christian evaluation.  (Hammond Aff., ¶ 8; Shane Aff. ¶ 9; Spinks Aff. ¶ 5)

9.      During IEP meetings, H.F. had asked for more "mainstreaming" opportunities for H.H., including being placed in a regular kindergarten room.  (Spinks Aff. ¶ 5)

10.     The amount of mainstreaming that H.H. received in the 2005/2006 school year was consistent with her educational and behavioral capabilities, and it would have been educationally inappropriate to place her in a regular or "mainstreamed" classroom. (Shane Aff. ¶ 9; Moffett Aff. ¶ 10; Spinks Aff. ¶ 6).

11.     H.H.'s mainstreaming opportunities included daily walking and weekly physical therapy which usually occurred in the hallways where she could pass by and experience other students, accompanying Moffett to the school office to drop off attendance records; outdoor recess with other students; school assemblies; and daily contact with an assigned fifth grade

greeter. (Minguzzi Aff. ¶ 6; Diverdi-Payne Aff.. ¶ 6; Gara Aff. ¶ 6; Spinks Aff. ¶ 6; Crandol Aff. ¶ 9; Zawadzki Aff. ¶ 5; McCole Aff. ¶ 7; Moffett Aff., ¶ 9E)

12.     While in Moffett's classroom. H.H. was frequently out of her wheelchair.  (Hill Aff. ¶ 8, McCole Aff. ¶  6, Waldrop Aff. ¶ 8, Zawadzki Aff. ¶ 6, Minguzzi Aff. ¶ 6 and ¶ 9; Gara Aff. ¶ 5, Stoots Aff. ¶ 5; Hawthorne Aff. ¶ 6, Hines Aff. ¶ 4, May Aff. ¶ 7.)

13.     For safety reasons, H.H. was never allowed to be taken far from her wheelchair (Moffett Aff. ¶ 7)

14.     On April 18, 19 and 20. 2006, H.F., without permission or authorization and without the knowledge of Moffett, Minguzzi or any Chesterfield County School Board official or employee, hid a recording device on H.H.'s wheelchair so that she could eavesdrop on conversations between School employees.  The recordings submitted with this Memorandum are accurate copies of those recordings (Shane Aff. ¶ 13; Parthemos Aff. Ex. A)

15.     Moffett and H.F. jointly kept a contemporaneous notebook of H.H.'s behavior throughout the school year.  The entries in the notebook accurately depict H.H.'s progress, activities and behavior during the course of the year. (Moffett. Ex. B.)

16.     Therapy notes attached to the Affidavits of Diverdi-Payne and Alcaraz, nurse's notes attached to the affidavit of McCole, and the report attached to Hammond's affidavit are records which accurately describe the progress and educational services provided to H.H. (Diverdi-Payne Aff.; Alcaraz Aff. ¶6; McCole Aff.; Hammond Aff.)

17.     H.F. herself placed the lap belt on H.H.'s wheelchair and used it when she transported H.H. to and from school every day.  The Gates school staff also used the lap belt, but only when appropriate for H.H.'s  instruction and safety (Moffett Aff. ¶ ¶ 6-8, Ex. B; Hawthorne Aff. ¶7; May Aff. ¶ 10)